UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. C18-1845-JCC |
| Plaintiff, | ORDER |
| v. | |
| CHARLES PILLON, | |
| Defendant. | |

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt. No. 9). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I. BACKGROUND

Defendant is the owner of real property in King County (the "Property"), which he has used as an unpermitted landfill for many years. (Dkt. No. 9 at 2.) The Property contains, or has recently contained, many different kinds of waste, including vehicles, unlabeled containers, and chemical waste. (*Id.*) Over decades, the Property has been investigated more than 20 times by various law enforcement agencies for unpermitted activities as well as hazardous waste management violations. (*Id.*)

In February 2016, the United States Environmental Protection Agency (the "EPA" or the

"Government") conducted a one-day sampling event at the request of the Washington State Attorney General's Office. (*Id.* at 3.) The EPA was tasked with identifying and sampling containers potentially containing hazardous substances and areas of potentially contaminated soil. (*Id.* at 3.) The EPA observed hundreds of unmarked and mislabeled containers that appeared to be leaking. (*Id.*) Results for every surface soil samples exceeded cleanup levels for cadmium, chromium, benzo(a)pyrene, total toxicity equivalent concentration ("TTEC"), and/or motor oil range organics. (*Id.* at 3.)

In July 2018, the Washington Department of Ecology asked the EPA to perform an emergency removal action at the Property. (*Id.* at 4; Dkt. No. 9-6.) The EPA visited the Property to evaluate the extent of the contamination. (Dkt. No. 9 at 5.) The EPA obtained consent from Defendant to walk around and observe the Property. (*Id.*) During this walk-through, the EPA observed approximately 250 containers, some of which evidenced leaking. (*Id.*) After the July 2018 visit, Defendant was reluctant to grant the EPA access to the Property. (Dkt. Nos. 9 at 6–7, 9-7–9-17.) Defendant has since sent a series of emails to the EPA outlining his objections to its involvement on the Property. (Dkt. Nos. 9-7–9-17.) In October 2018, the EPA emailed Defendant to request access to the Property, to which Defendant responded with multiple emails indicating his refusal to consent. (Dkt. No. 9-13–9-17.) Thereafter, the EPA applied to the court for an administrative warrant to access and clean-up the Property. *United States v. May Creek Landfill Site*, Case No. C18-0114-JPD, Dkt. No. 1 (W.D. Wash. 2018).

In November 2018, Judge Donohue granted the EPA a 30-day administrative warrant. *United States v. May Creek Landfill Site*, Case No. C18-0114-JPD, Dkt. No. 4. After gaining access to the Property with that warrant, the EPA took samples, conducted further inspections of the premises, and removed and processed over 1,600 containers of chemicals. (Dkt. No. 9 at 8.) In the process of sampling the soil, the EPA identified three different areas on the Property where soil contamination seemed most likely—the Landfill Area, the Workshop Area, and the Bus Area. (Dkt. Nos. 9 at 8, 9-19.) In the Landfill Area, eight test pits were excavated. (Dkt. No.

9 at 10.) Soil samples from the eight test pits showed only modest levels of contamination—the EPA has concluded that further action at these pits is not required. (*Id.* at 9–10; *see also* Dkt. No. 9-20.) However, apart from the eight test pits, other soil samples in the Landfill Area showed levels of petroleum contamination in a range that warrants further action. (Dkt. Nos. 9 at 11–12, 9-20 at 20.) Defendant appears to use the Workshop Area to work on vehicles. (Dkt. No. 9 at 10.) Soil samples from this area showed elevated concentrations of lead, cadmium, and hydrocarbons in the motor and diesel ranges. (Dkt. Nos. 9 at 9–10, 9-20 at 16.) The presence of the oil and diesel contamination requires further action. (Dkt. No. 9 at 9–10.) Soil sampling in the Bus Area was similar to soil sampling in the Workshop Area. (*Id.*; Dkt. No. 9-20 at 20.) Finally, surface water samples were taken during this 30-day period. (Dkt. No. 9 at 11–12.) Nearly all of the samples showed concentrations of petroleum that warrant further action. (*Id.;* Dkt. No. 9-20 at 25.)

Even after that 30-day clean-up and testing period, contaminated soil remains and the EPA is unsure about whether there is any groundwater contamination. (*Id.* at 12–13; *see also* Dkt. Nos. 9-19, 9-20.) The EPA asserts that, to address the contamination and threats at the Property, the following actions need to be taken: removal of soils known to be contaminated; testing of soils in the areas of contamination to ensure that all soils contaminated above action levels have been removed; and installation of groundwater monitoring wells to monitor groundwater that has been, or may become, contaminated. (Dkt. No. 9 at 13.) The Government intends to only be present on Defendant's property for around two months. (Dkt. No. 8 at 16.) Because of the EPA's designation of specific zones of likely contamination and because of the short time period of the Government's presence, its remedial plan is tailored. (Dkt. No. 9 at 13; *see also* Dkt. No. 9-20.) The Government brings the present motion for summary judgment, seeking access to the Property so that it can perform these additional remedial actions. (Dkt. No. 8.)

//

ORDER
C18-1845-JCC
PAGE - 3

## II. DISCUSSION

### A. Summary Judgment Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is genuine if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is material if the fact "might affect the outcome of the suit under the governing law." *Id.* At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id.* at 255.

### B. Superfund ("CERCLA")

CERCLA grants the EPA broad powers to clean-up sites where it has "a reasonable basis to believe that there may be a release or threat of release of a hazardous substance." 42 U.S.C. § 9604(e)(1). CERCLA defines release as "any spilling, leaking, . . . emitting, emptying, . . . leaching, dumping, or disposing into the environment . . . ." 42 U.S.C. § 9601(22). When an actual release or substantial threat of release of a hazardous substance occurs, the EPA is "authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . or take any other response measure consistent with the national contingency plan" that the EPA deems necessary to protect the environment. 42 U.S.C. § 9604(a)(1).

Under CERCLA, there are a number of ways that the EPA may access a site. The EPA may enter "[a]ny vessel, facility, establishment, or other place or property" where: (1) hazardous substances have been generated, stored, treated, disposed of, or transported from; (2) hazardous substances may have been released; (3) a hazardous substance's release is threatened; or (4) entry is necessary to effectuate a response action. 42 U.S.C. § 9604(e)(3). Once the EPA has gained access, it may inspect and collect samples, "determin[e] the need for response, or

choos[e] or tak[e] any response action under this subchapter, or otherwise enforc[e] the provisions of this subchapter." 42 U.S.C. § 9604(e)(1).

If the EPA cannot obtain consent from the landowner to enter the site, it may obtain access either by an administrative order or a court order directing compliance with the request for access. 42 U.S.C. § 9604(e)(5)(A)–(B).

### C. EPA Property Access Legal Standard

In order to gain access to the property through court order, the Government must demonstrate the following: First, the Property must be a type that the Government is allowed to enter under the statute. 42 U.S.C. § 9604(e)(3). Second, the Government must have a "reasonable basis to believe there may be a release or threat of release of a hazardous substance." 42 U.S.C. § 9604(e)(1). Third, the Government must have first requested, and been unsuccessful in obtaining, the property owner's consent. 42 U.S.C. § 9604(e)(5)(A)–(B). Finally, the Government must seek entry only to perform response actions covered by the statute. 42 U.S.C. §§ 9601(23)–(25), 9604(a)(1), 9604(e)(1).

#### 1. <u>Type of Property</u>

The Government is authorized to enter "[a]ny vessel, facility, establishment, or other place or property" where: (1) hazardous substances have been generated, stored, treated, disposed of, or transported from; (2) hazardous substances may have been released; (3) a hazardous substance's release is threatened; or (4) entry is necessary to effectuate a response action. 42 U.S.C. § 9604(e)(3). The statute defines "facility" to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9).

The Government has submitted evidence that Defendant's property is a place that meets any one of the four types of sites covered by the statute. The Government has been working with Defendant for over three years to clean-up his property. (Dkt. No. 9 at 2.) The Government has previously entered Defendant's property and obtained samples that show the presence of

ORDER
C18-1845-JCC
PAGE - 5

hazardous substances[1] in the soil and groundwater. (*Id.* at 2–3, 8–12; Dkt. No. 9-20.) Additionally, the Government has inspected and tested containers on Defendant's property which indicate that he is storing and/or disposing of hazardous substances on his property. (Dkt. No. 9 at 2–3, 8–12.) The lengthy history between the parties and Defendant's failure to improve the Property suggests Defendant is unwilling or unable to clean it up, indicating that the Government's entry onto Defendant's property is necessary to accomplish that goal.

Defendant presents no evidence to the contrary. He argues that water testing has been contradictory and inconsistent, that the water running through the Property gets cleaner as it runs through it, and that he is capable of cleaning up the Property on his own. (Dkt. No. 14 at 5–6.) But there is no evidence to support any of these allegations. On the contrary, the record indicates that Defendant's property has repeatedly tested positive for hazardous substances and that remedial action is necessary. (Dkt. Nos. 9 at 2–3, 8–12; 9-20.) Therefore, the Government has shown that there is no genuine dispute that the Property is of the type that CERCLA authorizes the Government to enter.

2. Reasonable Basis

Before the Court compels Defendant to allow the Government access to the Property, there must be a reasonable basis to believe that there may be a release or a threat of release of hazardous substances into the environment. *See* 42 U.S.C. § 9604(e)(1). As discussed above, the Government has taken samples from the Property and continued to inspect the Property for years. (Dkt. No. 9 at 2–3, 8–12.) During this time, the Property has produced samples that contain hazardous substances. (*Id.*) Very recently, the Government has obtained soil and water samples from the Property, which again show high levels of multiple hazardous substances. (*Id.*) In other words, over the course of time, Defendant's behavior with respect to releasing hazardous

---

[1] The chemicals present in the soil and groundwater at Defendant's property qualify as hazardous substances, as defined by CERCLA. *See* 42 U.S.C. § 9601(14); 42 U.S.C. § 6921; 40 C.F.R. § 302.4.

substances on the Property has not improved. The Government has no reason to believe Defendant has cleaned up the recently-tested soil. Based on Defendant's past conduct and the recently-tested soil, it is reasonable to believe that there is a release or threat of release of hazardous substances on the Property. Defendant has submitted no evidence that refutes this—instead, he attempts to minimize the harm caused by the storage of the hazardous substances. (Dkt. No. 14 at 2–5.) He also argues that his Property is good for the environment—the water running through the Property gets cleaner as it does; the Property is clean enough to host a salmon habitat; and his storm water drainage system and composting operation prevents erosion. (*Id.* at 5–7.) But there is no evidence of these contentions and it is not clear how these facts, if they were true, would change the Government's reasonable belief that there is a release or threat of release of hazardous substances on the Property. Therefore, there is no genuine dispute that the Government holds a reasonable belief that there is a release or threat of release of hazardous substances on the Property.

### 3. Consent

Before the Court is authorized to issue an order compelling a property owner to allow the Government access to his property, the Government must first seek the property owner's consent. *See* 42 U.S.C. § 9604(e)(5)(A)–(B). Here, the record demonstrates that the Government has sought Defendant's consent in accessing the Property. (Dkt. Nos. 9-7–9-17.) The record contains emails in which the Government seeks Defendant's consent in accessing the Property. (*Id.*) Defendant responded with objections to the Government's handling of the inspection and clean-up and its conclusions. (*Id.*) The Government told Defendant that it was interpreting his responses as a denial of consent. (Dkt. No. 9-12 at 7.) Defendant did not return a consent form and did not indicate his consent in any other email in the record. (Dkt. Nos. 9-7–9-17.) Defendant presents no evidence to the contrary. Therefore, there is no genuine dispute about whether Defendant denied the Government access to the Property before the Government sought this order.

ORDER
C18-1845-JCC
PAGE - 7

####4. Response Actions

The statute defines response to mean "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). "Remove" or "removal" mean "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, . . . or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage . . . which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23). "Remedy" or "remedial action" mean virtually any action "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24).

In this case, the Government intends to remove contaminated soils and chemical containers, construct groundwater monitoring wells, take groundwater samples, and take surface water samples as needed. (Dkt. No. 9 at 13.) All of this proposed conduct qualifies as "removal" or "remedial action" within the meaning of the statute because it will all be done "to prevent or minimize the release of hazardous substances." *See* 42 U.S.C. § 9601(24). Defendant complains that the construction of groundwater monitoring wells will be expensive to him, but he does not refute that these response actions are allowed under the statute. (*See* Dkt. No. 14 at 6.) Therefore, there is no genuine dispute that the Government's proposed responses are those contemplated by CERCLA.

### III. CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment (Dkt. No. 9) is GRANTED. The Court ORDERS that:

1. The EPA is authorized to enter during reasonable business hours and to respond to hazardous substances, pollutants, or contaminants, located on and under property owned and controlled by Defendant at 15753 Renton-Issaquah Road SE, Renton, King County, Washington (the "Property"). In particular, EPA and its contractors may (a) remove hazardous substances, pollutants, or contaminants from the Property,

1. including but not limited to soils contaminated with hazardous substances, pollutants, or contaminants; (b) install groundwater monitoring wells at the Property; and/or (c) to take samples at the Property, including samples of soil, groundwater, and surface water;

2. The EPA is authorized to bring to the Property and to utilize there whatever equipment, machinery, or other tools are necessary to carry out the response activities in Paragraph (1). The EPA may take photographs, videos, or otherwise document the conditions at the Property and its activities at the Property.

3. Defendant is hereby prohibited from impeding or interfering with the EPA's (including the EPA's contractors) access and response activities on the Property;

4. Defendant is hereby prohibited from tampering with preventing access to, defacing, or destroying groundwater monitoring wells or other equipment placed on the Property by the EPA (including the EPA's contractors);

5. If the EPA obtains any samples, before leaving the premises it shall give to the owner, operator, tenant, or other person in charge of the place from which the samples were obtained a receipt describing the sample obtained and, if requested, a portion of each such sample. A copy of the results of any analysis made of such samples shall be furnished promptly to the owner, operator, tenant, or other person in charge, if such person can be located.

6. If any items subject to this order are taken from the premises, the EPA shall give to the person from whom or from whose premises the items are taken a copy of this order and a recipient for the items taken, or shall leave the copy and receipt at the place from which the items are taken;

7. The relief granted in Paragraphs (1) and (2) shall be in effect for 120 days after the issuance of this order. After the EPA (including the EPA's contractors) has completed the response actions authorized in Paragraph (1) above, the EPA shall file within 30

days of completion a status report summarizing those response actions.

DATED this 20th day of May 2019.

							*John C. Coughenour*
							John C. Coughenour
							UNITED STATES DISTRICT JUDGE